## AFFIDAVIT

I, Michael S. Sirohman, a Special Agent (SA) of the Federal Bureau of Investigation (FBI), Cleveland Division, being duly sworn on oath, hereby deposes and states:

## INTRODUCTION AND SPECIAL AGENT BACKGROUND

1.  Affiant is an investigative and law enforcement officer of the United States within the meaning of Title 18 U.S.C. § 2510(7) as a Special Agent of the Federal Bureau of Investigation (FBI). Affiant is authorized to conduct investigations and to make arrests for offenses enumerated in Title 18 U.S.C. § 1589(a).

2.  I have been a Special Agent of the FBI for approximately twelve (12) years.  I am currently assigned to the Cleveland Division, Canton Resident Agency.  While employed by the FBI, I have conducted and assisted with numerous federal criminal investigations and prosecutions related to, among other things, civil rights violations, Internet fraud, bank fraud, economic crimes, and criminal conspiracies.  I have received hundreds of hours of law enforcement, tactical, and investigative training from the FBI and state and local law enforcement agencies, as well as on the job training.

3.  Through my participation in numerous federal criminal investigations and prosecutions I have gained extensive experience in performing interviews of witnesses, analyzing sources of information and targets of investigations, and executing search warrants.  I have also sought advice from FBI Special Agents more experienced than

1

myself in some of these matters.  Through investigations and training

I have become familiar with the organization, planning, and methods

of criminal conspiracies and federal civil rights violations.

### STATUTORY AUTHORITY

4.    The facts set out below are based upon information I have

obtained from documents and other law enforcement personnel.  I have

also reviewed statements made to law enforcement personnel.  I have

not set out all of the information I have learned during the course

of this investigation, but only that necessary to show that there is

probable cause to believe that from in or about May 2011, to in or

about October 2012, JORDIE L. CALLAHAN and JESSICA L. HUNT, along

with DANIEL J. BROWN, III, aka D.J. BROWN, and DEZERAH L. SILSBY, aka

DEZERAH L. MCGUIRE, and others, did intentionally and knowingly

conspire, combine, confederate and agree with each other to commit an

offense against the United States, that is, to hold S.E. and her

juvenile child, whose birth year is 2007 and whose identity is known

to your affiant and who will hereafter be referred to as JUVENILE

VICTIM, in a condition of forced labor and involuntary servitude, and

to knowingly obtain the labor and services of S.E. by one or more of

the following means:

    (a)   by means of force, threats of force, physical restraint,

          and threats of physical restraint to S.E. and JUVENILE

          VICTIM.;

    (b)   by means of serious harm and threats of serious harm to

2

S.E. and JUVENILE VICTIM

(c) by means of the abuse and threatened abuse of law and legal process; and

(d) by means of a scheme, plan and pattern intended to cause S.E. to believe that, if S.E. did not perform such labor and services, S.E. and JUVENILE VICTIM would suffer serious harm and physical restraint,

in violation of Title 18, United States Code, Sections 1589(a) and 2, and that in or about May 2013, JORDIE L. CALLAHAN and JESSICA L. HUNT knowingly attempted to intimidate, threaten, and corruptly persuade another person, namely WITNESS #6, with the intent to influence, delay, and prevent the testimony of WITNESS #6 in an official proceeding, namely the grand jury investigation of a forced labor conspiracy, and hinder, delay and prevent WITNESS #6's communication to a law enforcement officer of information relating to the commission of a federal offense, namely, a violation of Title 18, United States Code, Section 1589(a), in violation of Title 18, United States Code, Sections 1512(b)(1) and (b)(3).

**PROBABLE CAUSE**

5. Your affiant will set forth facts to establish probable cause that JORDIE L. CALLAHAN and JESSICA L. HUNT, along with DANIEL J. BROWN, III, aka D.J. BROWN, and DEZERAH L. SILSBY, aka DEZERAH L. MCGUIRE, conspired to secure the labor and services of S.E., knowing S.E. suffered from a cognitive disability and received monthly public

3

assistance payments.

6.    It was part of the offense that CALLAHAN and HUNT targeted and recruited S.E. and JUVENILE VICTIM to live with them in their apartment in Ashland, Ohio, an address known to the grand jury, where they lived with HUNT's four juvenile sons, numerous pit bulls, large snakes, and other reptiles.

7.    It was part of the offense that CALLAHAN and HUNT, along with DANIEL J. BROWN III, aka D.J. BROWN, and DEZERAH L. SILSBY, aka DEZERAH L. MCGUIRE, (personal friends of CALLAHAN and HUNT), intended to cause S.E. to believe that, if S.E. did not perform such labor and services, S.E. and JUVENILE VICTIM would suffer serious harm and physical restraint.

8.    It was part of the offense that CALLAHAN, HUNT, BROWN and SILSBY inflicted and caused serious physical harm to S.E. in order to obtain S.E.'s services and labor, government benefits, and prescription pain medication.

9.    On October 24, 2012, S.E. was arrested by an Ashland Police Officer for shoplifting a candy bar. Upon her arrest, S.E. asked to be taken to jail. S.E. advised the officer that she was living with JORDIE CALLAHAN and JESSICA HUNT at their apartment on Main Street in Ashland, Ohio, and that CALLAHAN and HUNT "were mean to her."

10.    On October 24, 2012, an Ashland Police Officer traveled to CALLAHAN and HUNT'S apartment and spoke with CALLAHAN. When the officer advised CALLAHAN that S.E. was not to return to CALLAHAN's

4

residence, CALLAHAN told the officer that he suspected S.E. was abusing JUVENILE VICTIM. CALLAHAN further advised the officer that he set up a video monitor to secretly observe S.E.'s interaction with JUVENILE VICTIM. CALLAHAN advised the officer that he had recorded S.E. abusing JUVENILE VICTIM and showed the police officer video on his mobile phone which showed S.E. repeatedly striking JUVENILE VICTIM on the baby monitor. Later investigation revealed that this recording was made on October 16, 2011.

11. The Ashland Police Department initiated a child abuse investigation. In the course of this investigation, Ashland Police Officers had additional discussions with S.E. regarding her time living with CALLAHAN and HUNT, as well as the video recording from October 2011.

12. S.E. told the officers that she knew about the video monitor and that she and JUVENILE VICTIM were kept under surveillance. S.E. further advised the officer that CALLAHAN and HUNT ordered her to hit JUVENILE VICTIM. S.E. said HUNT and CALLAHAN threatened to beat JUVENILE VICTIM "even harder" if S.E. did not hit JUVENILE VICTIM herself. S.E. told the officers she was afraid HUNT or CALLAHAN would hurt JUVENILE VICTIM. S.E. advised law enforcement that she complied because S.E. and JUVENILE VICTIM's room was always under surveillance using the video monitor and that HUNT and CALLAHAN would know if she did not do as they ordered.

13. WITNESS #1 advised law enforcement that when she was at

5

HUNT and CALLAHAN's residence she heard both CALLAHAN and HUNT tell
S.E. to "punish" JUVENILE VICTIM. WITNESS #1 advised law enforcement
that CALLAHAN and HUNT would say, "bust her [JUVENILE VICTIM'S] ass".

14. WITNESS #1 advised law enforcement that HUNT and CALLAHAN
used a video monitor to watch S.E. and JUVENILE VICTIM.

15. S.E. told the officers that on at least one occasion HUNT
had smacked JUVENILE VICTIM'S mouth so hard that it bleed. S.E. said
that on multiple occasions, HUNT grabbed JUVENILE VICTIM and hit her
over and over.

16. S.E. advised law enforcement of an occasion when HUNT did
not "approve" of how S.E. was striking JUVENILE VICTIM and HUNT
consequently tried to smash both S.E.'s and JUVENILE VICTIM's hands
with canned goods.

17. S.E. stated that CALLAHAN showed her video recordings of
S.E. hitting JUVENILE VICTIM after having been instructed to do so by
HUNT and CALLAHAN. CALLAHAN told S.E. that if S.E. "messed up" or
told law enforcement about her living circumstances, CALLAHAN would
show the videos to police and have JUVENILE VICTIM taken away from
S.E.

18. WITNESS #2 advised law enforcement that she heard HUNT and
CALLAHAN threaten S.E. WITNESS #2 advised law enforcement that HUNT
and CALLAHAN ordered S.E. to give them money or else CALLAHAN and
HUNT would "see to it" that S.E. lost JUVENILE VICTIM.

19. DANIEL J. BROWN told officers that CALLAHAN ordered him to

6

strike JUVENILE VICTIM. BROWN said that when he refused, CALLAHAN told him to instruct S.E. to strike JUVENILE VICTIM. BROWN advised law enforcement that he instructed S.E. to hit JUVENILE VICTIM and that CALLAHAN, HUNT, and BROWN then used their cell phones to record the screen of the baby monitor as they watched S.E. hit JUVENILE VICTIM on the monitor.

20. S.E. advised law enforcement that HUNT and CALLAHAN made S.E. care for their iguanas and numerous pit bulls, clean the house, do laundry, do yard work, and walk to the store to do their shopping.

21. WITNESS #2 advised law enforcement that HUNT would tell S.E. to go to Circle K to get pop and smokes. HUNT told S.E. that she had ten minutes to get back. WITNESS #2 advised law enforcement of an occasion when S.E. got back in time but both HUNT and CALLAHAN hit S.E. anyway. WITNESS #2 advised law enforcement that CALLAHAN hit S.E. with an open hand that day and HUNT punched her with a closed fist on the other side of the face.

22. S.E. advised law enforcement that she and JUVENILE VICTIM were constantly accused of stealing food from the household and that CALLAHAN and HUNT punished S.E. and JUVENILE VICTIM for allegedly stealing their food. S.E. advised law enforcement that HUNT would typically prepare a meal for herself, CALLAHAN, and HUNT's four sons, but S.E. and JUVENILE VICTIM would only be permitted to eat what was left over or canned food. S.E. recounted a time when she and JUVENILE VICTIM had not eaten all day and CALLAHAN got a plate of

7

food and gave it to the dog, rather than letting them eat.

23. WITNESS #3 advised law enforcement he saw JUVENILE VICTIM and S.E. eat a meal directly out of a single can of food that they had to share. WITNESS #3 advised law enforcement that HUNT or CALLAHAN had to give S.E. and JUVENILE VICTIM permission before they could eat.

24. S.E. advised law enforcement that HUNT was in possession of all of S.E.'s government benefits cards, including S.E.'s Direct Express, Ohio Works First, and Food Card. S.E. further advised law enforcement that HUNT had the PINs for those cards and HUNT normally used nearly all of S.E.'s money on the cards. HUNT rarely gave any money to S.E.

25. BROWN advised law enforcement that CALLAHAN and HUNT referred to S.E. as their "bank," which he said was the street name for a money-making scheme.

26. S.E. advised law enforcement that when CALLAHAN and HUNT sent her to the store, she was not allowed to take JUVENILE VICTIM, was not allowed to speak to anyone while she was out, and CALLAHAN and HUNT interrogated S.E. upon her return if CALLAHAN and HUNT thought she took too long. S.E. said that CALLAHAN questioned her at gunpoint on more than one occasion and that he took out his knife and threatened to cut her finger off when questioning her.

27. WITNESS #1 advised law enforcement that S.E. never left the house unless HUNT or CALLAHAN sent her to the store, and that S.E.

8

always went to the store by herself without JUVENILE VICTIM.  WITNESS
#1 advised law enforcement that S.E. was like HUNT and CALLAHAN's
maid and that HUNT and CALLAHAN made S.E. cook, clean, and do yard
work.

28.  WITNESS #4 advised law enforcement that he had seen
CALLAHAN point guns at S.E.'s head and say he [CALLAHAN] would shoot
S.E.  WITNESS #4 said he was sure S.E. was terrified.

29.  S.E. advised law enforcement that when she first stayed
with CALLAHAN and HUNT, S.E. and JUVENILE VICTIM were forced to sleep
on the cement basement floor with no mattress.

30.  S.E. advised law enforcement that she and JUVENILE VICTIM
were later moved to a room upstairs where S.E. and JUVENILE VICTIM
slept directly on the floor, with no bed or mattress.  S.E. advised
law enforcement the door to that room was tied closed during the day
to keep JUVENILE VICTIM from getting into the family's food while
S.E. cleaned.  S.E. further advised that at night, the door to this
room was padlocked to keep S.E. and JUVENILE VICTIM from escaping.
S.E. advised that CALLAHAN and HUNT ordered them to look at the
camera in their room and ask to be let out to use the bathroom.

31.  BROWN advised law enforcement of an occasion when he spent
the night at HUNT and CALLAHAN's residence.  BROWN advised that from
10:00 p.m. until 7:00 a.m., the door to S.E. and JUVENILE VICTIM's
room was padlocked from the outside.  BROWN advised that on the
occasion that he spent the night, he saw S.E. gesture through the

monitor that she needed to use the bathroom. BROWN stated that
CALLAHAN handed a key to BROWN to let S.E out of her room. BROWN
advised that he let S.E. out to use the bathroom, and when she S.E.
was done, CALLAHAN locked her in the room again.

32.  S.E. told law enforcement that neither she nor JUVENILE
VICTIM were permitted to use the bathroom during the day until all of
the work that CALLAHAN and HUNT required of S.E. was finished.  S.E.
advised she was required to physically punish JUVENILE VICTIM for
urinating in her pants and that HUNT and CALLAHAN were both
physically violent toward S.E.

33.  WITNESS #4 advised law enforcement of an occasion when he
walked into CALLAHAN and HUNT's apartment and saw CALLAHAN punch S.E.
in the arm.  WITNESS #4 said S.E. was crying and CALLAHAN was
swearing and yelling at her.

34.  WITNESS #3 advised law enforcement that he saw HUNT drag
S.E. down the stairs from S.E.'s room by S.E.'s hair and HUNT held
S.E.'s face down by a mess made by one of HUNT and CALLAHAN's pit
bulls.  WITNESS #3 advised that HUNT was swearing at S.E. and telling
S.E. to clean up the dog urine or feces.

35.  WITNESS #3 advised law enforcement that HUNT and CALLAHAN
would order S.E. to do yard work and cleaning and threaten to "beat
her ass" if she did not do what she was told.

36.  WITNESS #4 advised law enforcement he had heard CALLAHAN
and HUNT yell at S.E. to punish JUVENILE VICTIM and that they

threatened S.E. with JUVENILE VICTIM being taken away if S.E. did not clean well enough.

37.  S.E. advised law enforcement that she was not allowed to feed JUVENILE VICTIM or give JUVENILE VICTIM anything to drink without obtaining permission from CALLAHAN and HUNT, and that it would regularly be after 8:00 p.m. before S.E. was allowed to feed JUVENILE VICTIM.  S.E. said there were times the pit bull dogs were fed the leftovers instead of S.E. and JUVENILE VICTIM.  S.E. said that S.E. was not able to feed fruit or vegetables to her daughter, but CALLAHAN and HUNT ordered her to feed fruits and vegetables to the Iguana that freely roamed in S.E. and JUVENILE VICTIM'S bedroom.

38.  WITNESS #1 advised law enforcement that S.E. and JUVENILE VICTIM's food was locked up and that HUNT and CALLAHAN had the only key.

39.  S.E. told law enforcement that CALLAHAN and HUNT would bind up JUVENILE VICTIM with rope or tape to prevent JUVENILE VICTIM from getting into HUNT and CALLAHAN's food or getting something to drink. S.E. said that sometimes HUNT taped JUVENILE VICTIM's hands herself, and on other occasions HUNT and CALLAHAN had each ordered S.E. to bind JUVENILE VICTIM.  S.E. stated that on multiple occasions she tried to remove the bindings from her daughter, but HUNT and CALLAHAN were watching S.E. on the video monitor and one of HUNT's sons would come up to the room and tell S.E. to leave JUVENILE VICTIM bound. S.E. stated that sometimes JUVENILE VICTIM remained bound all night.

11

40. WITNESS #1 advised law enforcement that S.E. and JUVENILE VICTIM were always in the upstairs room, or JUVENILE VICTIM was upstairs and S.E. was cleaning. WITNESS #1 advised that she saw CALLAHAN and HUNT watch S.E. and JUVENILE VICTIM on the video monitor. WITNESS #1 advised that she had asked HUNT why S.E. and JUVENILE VICTIM had to stay in the upstairs room, and HUNT told her "because they're gross."

41. S.E. told law enforcement that the room where she and JUVENILE VICTIM were kept got very hot, and S.E. worried about JUVENILE VICTIM being up there in the heat with nothing to drink. S.E. said HUNT would not let her give a bottle of water to JUVENILE VICTIM because JUVENILE VICTIM would have to go to the bathroom.

42. WITNESS #1 advised law enforcement that the room where S.E. and JUVENILE VICTIM were ordered to stay likely got up to 100 degrees in the summer and that she "was surprised JUVENILE VICTIM did not die."

43. WITNESS #5 was interviewed by law enforcement at the Ashland Police Department. At the time of the interview, WITNESS #5 was being held in the Ashland County Jail pending charges for a burglary. WITNESS #5 told law enforcement that he had visited HUNT and CALLAHAN's apartment on multiple occasions to buy drugs. WITNESS #5 advised law enforcement that CALLAHAN's snake collection included a poisonous coral snake, a ball python, and a Burmese python that weighed approximately 130 lbs. WITNESS #5 said he saw CALLAHAN put

snakes on S.E. and put snakes in JUVENILE VICTIM's face and that
JUVENILE VICTIM would get scared and cry.

44. S.E. advised law enforcement that on one occasion S.E.
escaped from CALLAHAN and HUNT's apartment with JUVENILE VICTIM and
went to S.E.'s mother's house. S.E. advised that HUNT and CALLAHAN
sent BROWN and SILSBY to retrieve S.E. from her mother's house under
the guise of taking S.E. to get ice cream at Dairy Queen.

45. BROWN advised law enforcement that HUNT and CALLAHAN called
BROWN and asked BROWN to help retrieve S.E. when S.E. went to her
mother's house. CALLAHAN and HUNT told BROWN to tell S.E. BROWN was
going to take S.E. for ice cream, but instead to bring S.E. back to
HUNT and CALLAHAN'S apartment. BROWN advised that BROWN and SILSBY
went to retrieve S.E. and JUVENILE VICTIM. BROWN advised that SILSBY
drove to Dairy Queen and waited in the car while BROWN walked to
S.E.'s mother's house. BROWN advised that he lied to S.E.'s mother
and told her he was not taking S.E. back to CALLAHAN and HUNT's,
when, in fact, he knew that was the plan.

46. BROWN advised law enforcement that SILSBY drove them all
back to HUNT and CALLAHAN's apartment.

47. SILSBY advised law enforcement that when S.E. and JUVENILE
VICTIM left to stay at S.E.'s mother's house, HUNT and CALLAHAN asked
SILSBY to go retrieve S.E. SILSBY advised that the plan was to tell
S.E. they were taking S.E. for ice cream, but then to take S.E. back
to HUNT and CALLAHAN'S apartment. SILSBY advised that she drove S.E.

13

back to HUNT and CALLAHAN's apartment after BROWN convinced S.E. to return.

48.   BROWN advised law enforcement that after S.E.'s return, CALLAHAN gave BROWN two dollars and told him to get screws for the windows.   BROWN advised that he brought patio or decking screws back to CALLAHAN and handed them to CALLAHAN one at a time as CALLAHAN screwed the windows in S.E. and JUVENILE VICTIM's bedroom shut with a power drill to prevent S.E. from escaping out the windows.

49.   S.E. advised law enforcement of another occasion when HUNT and CALLAHAN learned S.E. was planning to escape.   S.E. advised that CALLAHAN and HUNT had BROWN come over and shave S.E.'s hair into a mohawk.   S.E. advised BROWN wrote "slut", "tramp", and "whore" on S.E.'s face and chest in permanent marker.   S.E. advised HUNT and CALLAHAN watched and told BROWN the words to write and where to write them.   S.E. advised that afterward, CALLAHAN and HUNT made S.E. clean her hair up off the floor without a broom or dust pan.

50.   BROWN advised law enforcement that CALLAHAN and HUNT shaved S.E.'s head after discovering a note that CALLAHAN and HUNT believed indicated that S.E. was planning to escape.   BROWN advised that CALLAHAN held S.E. down while BROWN and HUNT wrote "cheater", "whore" and "bitch" on S.E. with permanent marker and then CALLAHAN wrote "skank".

51.   S.E. advised law enforcement of an occasion when CALLAHAN told her to put her hand on a door frame, and SILSBY slammed the door

14

on her hand so hard that CALLAHAN had to pull the door open, so S.E. could free her hand.

52. SILSBY advised law enforcement of an occasion when CALLAHAN had the idea to smash S.E.'s hand and then send S.E. to the emergency room to get pain pills for CALLAHAN, HUNT, and SILSBY. SILSBY advised that she smashed S.E.'s hand with a rock. SILSBY stated that she took S.E. to the emergency room and that HUNT and CALLAHAN both instructed S.E. to "cheek" the pain pill she was given in the emergency room and bring it back to CALLAHAN and HUNT, along with the prescription for pain medication. "Cheek" is a term known to your affiant through training and experience to mean holding a pill in the side of one's mouth rather than swallowing it.

53. Medical records indicate that on August 19, 2011, S.E. visited the emergency room for a hand injury and was prescribed acetaminophen-hydrocodone. Medical records also indicate that S.E. visited the emergency room again on August 25, 2011, and received a prescription for tramadol.

54. Medical records indicate that S.E. visited the emergency room May 30, 2012, for hip pain. The document indicates a prescription for acetaminophen-hydrocodone (Vicodin).

55. WITNESS #4 advised law enforcement that CALLAHAN said that he [CALLAHAN] had kicked S.E. in the hip and taken S.E. to the emergency room.

56. WITNESS #6 advised law enforcement that during a telephone

15

conversation with HUNT in or about February 2013, HUNT asked WITNESS #6 to be a witness for her and told WITNESS #6 what she should say about S.E. in relation to HUNT and CALLAHAN's case. WITNESS #6 advised law enforcement that HUNT threatened to turn WITNESS #6 in for bad checks if WITNESS #6 did not testify to what HUNT and CALLAHAN wanted WITNESS #6 to say. WITNESS #6 advised law enforcement that CALLAHAN was on the phone in the background during this same phone call and threatened to shoot WITNESS #6 if WITNESS #6 did not comply with the request.

57. Beginning on the morning of May 10, 2013, and continuing through the afternoon of May 10, 2013, FBI agents simultaneously conducted several interviews of other witnesses in connection to the investigation. As a result of these interviews, HUNT and CALLAHAN likely learned of the FBI's involvement in the investigation on that date. WITNESS #1 advised law enforcement that on the morning of May 10, 2013, within an hour of the FBI leaving her residence, HUNT knocked at her door, but WITNESS #1 did not answer the door. WITNESS #1 advised law enforcement that CALLAHAN came to her door soon after and said to round everybody up because the FBI was coming.

58. WITNESS #6 advised law enforcement on the afternoon of May 10, 2013, that at approximately 4:52 p.m., HUNT told WITNESS #6 the FBI would be looking for WITNESS #6 because they were talking to everybody. WITNESS #6 advised law enforcement that HUNT reiterated the earlier threats to turn WITNESS #6 in for warrants and also said

16

"something bad" would happen to WITNESS #6 if WITNESS #6 did not give HUNT and CALLAHAN's version of the story. WITNESS #6 advised law enforcement that CALLAHAN was in the background on the second call saying that law enforcement was "trying to get everybody on all this stuff".

59.   WITNESS #6 provided law enforcement with copies of a FACEBOOK conversation between WITNESS #6 and HUNT. These FACEBOOK records show the following messages were sent between HUNT and WITNESS #6 on May 10, 2013:

| | |
|---|---|
| HUNT: | "Sis what your number" |
| WITNESS #6: | "K i need to talk to you when will you have it back on" |
| HUNT: | "I dont wanna talk about it on here but i have no way to get on facebook so ill just have to try. hey find away to call me at 4196064363 im at that number now" |
| WITNESS #6: | "K call me as soon as you can sis your never gonna believe what is going on ill be at that number all night make sure you call love ya sis" |

### CONCLUSION

In consideration of the foregoing facts, Affiant respectfully requests that this Court find probable cause that JORDIE L. CALLAHAN and JESSICA L. HUNT, along with DANIEL J. BROWN and DEZERAH L. SILSBY, violated Title 18, United States Code Sections 1589(a) and 2, in that from in or about May 2011, until in or about October 2012, they knowingly and willfully held S.E. and JUVENILE VICTIM in a condition of forced labor and involuntary servitude, and knowingly obtained the labor and services of S.E., through the use of physical

17

restraint, force, threats of force, or legal coercion.

In consideration of the foregoing facts, Affiant also respectfully requests that this Court find probable cause that in or about May 2013, JORDIE L. CALLAHAN and JESSICA L. HUNT violated Title 18, United States Code, Sections 1512(b)(1) and (b)(3), in that they knowingly attempted to intimidate, threaten, and corruptly persuade WITNESS #6, with the intent to influence, delay and prevent the testimony of WITNESS #6 in an official proceeding, namely the grand jury investigation of a forced labor conspiracy, and attempted to hinder, delay and prevent WITNESS #6's communication to a law enforcement officer of information relating to the commission of a federal offense.

Michael S. Sirohman
Special Agent
Federal Bureau of Investigation
Cleveland, Ohio

Subscribed and sworn to before me this 17th day of June, 2013.

Nancy A. Vecchiarelli
United States Magistrate Judge

18